**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VALARIE GALVAN, | ) |
| | ) |
| Plaintiff, | ) No. 10 C 4824 |
| | ) |
| v. | ) Magistrate Judge Cox |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER[1]**

Plaintiff, Valarie Galvan ("Galvan"), seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for a period of disability and for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").[2] Galvan has filed a motion for summary judgment [dkt. 24], seeking a judgment reversing or remanding the Commissioner's final decision. The Commissioner has in turn filed a cross-motion [dkt. 26]. For the reasons set forth below, the Commissioner's motion is granted and Galvan's motion is denied.

I.      PROCEDURAL HISTORY

On March 17, 2008, Galvan filed an application for DIB, alleging a disability onset date of March 1, 2007.[3] The SSA denied her application initially, and again upon reconsideration.[4]

---

[1]      On March 10, 2011, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (dkts. 16, 18).

[2]      *See* 42 U.S.C. §§ 416(i), 423.

[3]      R. at 131, 138; 161.

[4]      R. at 70, 75, 83, 87.

Thereafter, Galvan filed a timely written request for a hearing, which was granted.[5] On June 15,

2009, a hearing was conducted before Administrative Law Judge ("ALJ") Daniel Dadabo in Peoria,

Illinois.[6] During the hearing, the ALJ heard testimony from Galvan and vocational expert ("VE")

Craig Johnston.

On September 1, 2009, the ALJ issued an unfavorable decision finding that Galvan was not

disabled under the Act.[7] On September 9, 2009, Galvan appealed the ALJ's determination to the

Appeals Council of the SSA.[8] The Appeals Council denied Galvan's request on June 25, 2010,

making the ALJ's ruling the final decision of the Commissioner.[9] Galvan timely filed the instant

action on August 2, 2010.[10]

## II.     STATEMENT OF FACTS

We now summarize the administrative record. We set forth the background evidence

concerning Galvan's medical history, including the objective medical evidence considered by the

ALJ. We then discuss the hearing testimony, before addressing the ALJ's opinion.

## A.     Introduction and Medical Evidence

Galvan was born on June 9, 1976, making her thirty-three years old on the date that the ALJ

issued his decision.[11] Galvan graduated from high school in 1996, and completed a vocational

training program in 2009.[12] Before suffering a gun shot wound to her left leg and buttock on January

---

[5]   R. at 91.
[6]   R. at 12-49.
[7]   R. at 57-69.
[8]   R. at 5-6.
[9]   R. at 1-4; 20 C.F.R. § 404.981; *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).
[10]   Pl.'s Compl. (dkt. 1).
[11]   R. at 131, 57.
[12]   R. at 166, 448.

22, 2000, Galvan worked as a cook and a machine operator, among other low-to-medium-skilled labor jobs.[13]  After she was shot, Galvan sporadically wored similar part-time jobs, including one month as a dishwasher and several months as an inventory counter.[14]  Galvan states that she left the dishwasher job because it required her to stand for six hours and to carry heavy trays of dishes, causing pain in her injured leg.[15]  In 2009, Galvan was terminated from her position at the inventory job, when her leg injury became apparent to her employer.[16]

Galvan has four biological children, three of whom were not living with her at the time of the hearing.[17]  Due to Galvan's substance abuse problems, her eldest child had been adopted, while her second and third children lived elsewhere and received supervised visits.[18]  Only Galvan's 16-month old infant daughter remained in her care.[19]  Galvan has never married, though she receives some financial support from her infant's father.[20]  In 2009, Galvan moved from Haymarket Center[21] to her brother's home in Cicero, in order to obtain childcare while attending vocational training.[22]

Galvan claims she is disabled due to the gun shot wound to her left leg and buttock,[23] which resulted in the physical impairments of paresthesia,[24] foot drop,[25] and weakness in Galvan's left

---

[13]  R. at 162.
[14]  R. at 16, 33.
[15]  R. at 33.
[16]  R. at 34.
[17]  R. at 253.
[18]  R. at 253, 458.
[19]  R. at 19, 367.
[20]  R. 440, 459.
[21]  R. at 354.  Haymarket Center is a non-profit organization and residence offering rehabilitation programs for adults suffering from substance abuse.  HAYMARKET CENTER, www.hcenter.org (last accessed September 13, 2011).
[22]  R. at 449, 460.
[23]  R. at 62.
[24]  Paresthesia refers to a burning or tingling sensation generally felt in the hands, arms, legs or feet.  *NINDS Paresthesia Information Page, National Institute of Neurological Disorders and Stroke*, www.ninds.nih.gov.
[25]  Foot drop is "an inability to raise the front part of the foot due to weakness or paralysis of the muscles that lift the foot. As a result, individuals with foot drop scuff their toes along the ground or bend their knees to lift their foot higher than usual to avoid the scuffing . . . ." *NINDS Foot Drop Information Page, National Institute of Neurological Disorders and Stroke*, www.ninds.nih.gov.

foot.[26]   Galvan has also been diagnosed with anxiety and major depressive disorder without psychotic features,[27] arising from substance abuse,[28] her shooting, and childhood abuse.[29]

We begin our review of Galvan's relevant medical history on March 16, 2005, when Galvan visited the Loretto Hospital emergency room ("ER") for a scalp laceration suffered during an assault.[30]   Galvan arrived alone and ambulatory, and her wound was cleaned and dressed before discharge.[31]   On February 8, 2008, near the birth of her infant, Galvan received a psychiatric evaluation from registered nurse Aurora Prado ("R.N. Prado") at the John H. Stroger, Jr. Hospital ("Stroger Hospital"),[32] after reporting a history of postpartum depression.[33]   Galvan denied past psychiatric hospitalization, though she reported feeling depressed and anxious with isolative behavior, crying spells, insomnia, hypersomnia, and feelings of being trapped in social problems.[34]   Galvan denied suicidal or homicidal ideation.[35]   She reported that her step-father sexually molested her beginning at age seven, and she began abusing substances as a minor, including alcohol, crack cocaine, heroin, and marijuana.[36]   Galvan reported that she had stopped abusing substances during her pregnancy, but relapsed shortly before the evaluation.[37]

R.N. Prado found that Galvan was mentally oriented, maintained good eye contact, had an

---

[26]   R. at 358, 399.
[27]   R. at 319-20, 354.
[28]   R. at 346. The drugs listed in Galvan's history of addiction include EOTH (alcohol), cocaine, opioids and marijuana. Galvan began attending Narcotics Anonymous ("NA") and became sober around early February, 2008. *See* R. at 453.
[29]   R. at 252, 454 (suffered abuse from step-father between ages two and fourteen); R. at 458 (suffered serious injury from ex-boyfriend).
[30]   R. at 249.
[31]   R. at 245, 249.
[32]   R. at 252, 260.
[33]   R. at 252.
[34]   *Id.*
[35]   *Id.*
[36]   R. at 252-55.
[37]   R. at 255.

appropriate, hygienic appearance, was alert and cooperative, maintained good attention and concentration, and exhibited psychomotor activity and speech that were within normal limits.[38] R.N. Prado also found Galvan's affect appropriate, her thought process organized and goal directed, and her memory intact, though she noted Galvan had a congruent, anxious and depressed mood.[39] Galvan was prescribed Sertraline and Trazadone,[40] as well as Zoloft, for depression.[41]

On March 11, 2008, Galvan received a psychiatric evaluation from Greg Waitkoff, M.S., at the Cicero Family Services Clinic.[42] Galvan presented as alert and cooperative, with intact memory and appropriate thought content, affect, and orientation, but sad mood.[43] Mr. Waitkoff noted Galvan's substance abuse and assigned a Global Assessment of Functioning ("GAF") score of 40.[44] He attributed this score in part to poor social adjustment, noting Galvan does not have friends because those around her were not "a good influence."[45] Mr. Waitkoff also noted that Galvan reported listening to music, writing songs, playing piano and doing Sudoku puzzles.[46]

On March 17, 2008, and May 6, 2008, State agency psychologists, J. Flores and John Tomassetti, Ph.D.[47] described Galvan as having difficulty understanding, staying coherent, and concentrating due to being "out of it," and appearing very tired.[48] Dr. Tomassetti performed a Mental Residual Functional Capacity ("RFC") Assessment focused on Listings 12.04 (Affective

---

[38] R. at 255-56, 258.
[39] R. at 257.
[40] R. at 259.
[41] R. at 276-77.
[42] R. at 305, 311.
[43] R. at 310.
[44] R. at 305, 311.
[45] R. at 309.
[46] *Id.*
[47] R. at 157.
[48] R. at 158, 354.

Disorders), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance Addiction Disorders).[49]  Dr. Tomassetti found that Galvan was "moderately limited" in several areas, including the ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and to be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; and set realistic goals or make plans independently of others.[50]

Dr. Tomassetti found no marked limitations, concluding instead that most of Galvan's mental functions –  such as the ability to remember locations, understand and remember simple instructions, and sustain an ordinary routine without special supervision –  were "not significantly limited."[51]  Dr. Tomassetti noted Galvan's ability to care for herself and her child by preparing meals, cleaning, doing laundry and grocery shopping, using public transportation, and paying bills.[52]  Dr. Tomassetti noted that Galvan was able to listen to music, ride bicycles, and write,[53] but her problems with substance abuse made her guarded and distrustful.[54]

On May 1, 2008, Galvan received a medical examination from State agency physician, Debbie L. Weiss, M.D.[55]  Dr. Weiss observed that Galvan arrived unaccompanied and complained of numbness and paresthesia, destabilizing foot drop, and cramping in her left foot after prolonged walking.[56]  Dr. Weiss's examination showed that, consistent with a foot drop and a 0/5 score for

---

[49] R. at 338.
[50] R. at 352-53.
[51] Id.
[52] R. at 354.
[53] Id.
[54] Id.
[55] R. at 319.
[56] Id.

dorsiflexion in her left foot, Galvan was unable to heel walk with her left foot.[57] Galvan's right mid-

calf measured 34 centimeters in circumference, while her left mid-calf measured 29 centimeters.[58]

Dr. Weiss described Galvan's finger and hand grasp as unimpaired in either hand.[59]

Dr. Weiss also assessed Galvan's mental health. Galvan described a remote suicide attempt

and worsening depression after being shot.[60] Galvan reported suicidal thoughts, but not plans, in the

three months before the examination; her depression had improved since she began seeing a

therapist every two weeks.[61] Galvan also described having panic attacks accompanied by chest pain,

shortness of breath and hot flashes, which were relieved by splashing cold water on her face.[62]

Galvan stated that she experienced confusion, inability to sleep without Trazadone, and poor

memory.[63] Dr. Weiss noted that despite Galvan's reported history of depression and anxiety attacks,

she did not seem depressed or anxious, and her orientation, memory, appearance, behavior and

ability to relate were "entirely within normal limits."[64] Dr. Weiss concluded that Galvan's

symptoms appeared to be controlled by Sertraline,[65] and listed Galvan's pain medications as

Gabapentin and Ibuprofen.[66]

On May 19, 2008, Calixto Aquinas, M.D., examined Galvan to complete a Physical RFC

Assessment.[67] Dr. Aquinas opined that Galvan would be limited to lifting or carrying a maximum

---

[57] R. at 321-22.
[58] R. at 321. As later noted by Dr. George Sisson, the fasciotomy that Galvan underwent to treat her compression syndrome required the removal of some necrotic muscle. R. at 530.
[59] R. at 322.
[60] R. at 319.
[61] R. at 320.
[62] *Id.*
[63] R. at 319.
[64] R. at 322.
[65] *Id.*
[66] R. at 320.
[67] R. at 356.

of 20 pounds occasionally or 10 pounds frequently.[68] He assessed Galvan as able to stand, walk or sit, with normal breaks, for a total of about 6 hours in an 8-hour workday.[69] Dr. Aquinas noted that Galvan would be limited in the operation of foot controls and precluded from climbing ladders, ropes or scaffolds.[70] He completed a Disability Determination and Transmittal Form ("SSA form 831").[71]

On May 29, 2008, another State consultant, Terry Travis, M.D., examined Galvan[72] and also completed an SSA form 831.[73] Dr. Travis noted Galvan's reports of left leg injury, depression, anxiety and painful toes, but affirmed the initial determination of Galvan's functional capacity because there was no worsening of any previously documented impairment, nor any new impairment or treatment, and because the prior determination, as well as the rationale for it, were correct.[74]

Records from June through August 2008 show that Haymarket Center gave Galvan a psychiatric referral to Stroger Hospital.[75] There, a treating psychiatrist, Anne Strohm, Ph.D., noted Galvan's participation in a heroin, cocaine and alcohol detoxification program.[76] Dr. Strohm's notes reflect that Galvan suffered from nervousness, jitteriness, and difficulty concentrating when reading, which Dr. Strohm suggested may be symptoms of post-traumatic stress syndrome.[77] However, Dr. Strohm noted that Galvan's symptoms were controlled fairly well by her medications,[78] which Dr.

---

[68] R. at 357.
[69] *Id.*
[70] R. at 358.
[71] R. at 50-51.
[72] R at 383-88.
[73] R. at 52-53.
[74] R. at 384, 387.
[75] R. at 367.
[76] *Id.*
[77] R. at 368.
[78] R. at 369.

Strohm re-prescribed.[79]  On June 13, 2008, Dr. Strohm noted Galvan's complaints of twice-weekly chest pains,[80] which were unexplained by an electrocardiogram and x-ray.[81]

On June 13, 2008, Galvan was treated at Stroger Hospital ER for swelling in her third toe.[82] A radiology report showed bony fragments near the cuboid bone of Galvan's left foot, possibly caused by ossicles or bone fragments from a donor site, but not osteomyelitis.[83]   Galvan's medications were refilled, and she displayed good eye contact, but a flat affect.[84]

Galvan began receiving treatment at Winfield Moody Health Center ("Winfield) on October 8, 2008.  After an examination, Physician Assistant ("P.A."), Wasiu Durojaiye, measured Galvan's height (64 inches) and weight (170 pounds), and documented a body mass index of 29.29,[85] which was indicative of obesity.[86]  P.A. Durojaiye found that Galvan had weakness in her left foot and a left foot drop, as well as a large surgical scar over the tibia and fibia of the left leg.[87]  The right foot was normal.[88]  While Galvan reported a history of drug abuse, no mental symptoms were noted.[89]

P.A. Durojaiye again examined Galvan on October 17, 2008, finding that she had swelling of the left foot, peripheral neuropathy (nerve damage) and ankle pain, but that her pain was not affecting her activity level.[90]  On November 4, 2008, Dr. Murad Abdel-Qader confirmed these findings, also observing general weakness in the left foot due to nerve injury.[91]  Dr. Abdel-Qader

---

[79]  R. at 367-70.
[80]  R. at 368.
[81]  R. at 370.
[82]  R. at 375-82.
[83]  R. at 373, 379.
[84]  R. at 380.
[85]  R. at 403.
[86]  R. at 469 (endocrine assessment by anaesthesiologist prior to scar revision surgery).
[87]  R. at 404.
[88]  *Id.*
[89]  R. at 405.
[90]  R. at 396-97.
[91]  R. at 399-400.

instructed Galvan to treat her leg using rest, ice, compression, and elevation ("RICE") and physical therapy exercises, and instructed Galvan to return in three weeks for reevaluation.[92]

On November 20, 2008, P.A. Durojaiye once more examined Galvan upon her complaint of diarrhea and muscle cramps in her arms and legs.[93]  He prescribed Imodium for the diarrhea and Cyclobenzaprine, a muscle relaxant, for the cramps.[94]  On November 25, 2008, P.A. Durojaiye noted that, although pain was affecting Galvan's activity level, the pain was due to the strengthening exercises, and Galvan reported feeling "70% better."[95]

From June 17, 2008, until June 8, 2009, Galvan received psychological counseling, generally every two weeks, at the Mental Health Center of Cicero.[96]  Clinicians' reports show that, although Galvan's mental issues initially caused hypervigilance while traveling at night, recurrent nightmares of sexual abuse and being shot, and conflicts with family members,[97] over time Galvan progressed to stable, "euthymic" mood and sobriety, less anxiety, better sleep and proactive engagement in relieving family tension.[98]  These reports further noted Galvan's grief at being separated from her older children, but also her assertiveness in pursuing greater visitation rights to see them.[99]  The reports also noted that Galvan, though subject to panic attacks around stressful events, had no urges to use drugs, fewer PTSD triggers, and no insomnia.[100]

On November 10, 2008, Galvan reported that her part-time inventory job was going well, that

---

[92] R. at 400.
[93] R. at 407.
[94] R. at 408.
[95] R. at 401.
[96] R. at 435-60.
[97] R. at 439, 449, 458-59.
[98] R. at 459-60.
[99] R. at 447, 458.
[100] R. at 449.

she was enthusiastic about job training, and that she was considering employment with United Cerebral Palsy.[101] She verbalized commitment to sobriety and "getting her life on track."[102] Galvan reported feeling isolated, but acknowledged the risks of befriending substance abusers.[103]

After complaining of irritation in the scar on her lower left leg, Galvan was referred by P.A. Durojaiye to Dr. George Sisson for surgical treatment.[104] On January 22, 2009, Dr. Sisson performed a pre-operative examination, which found that Galvan's cardiovascular system was unproblematic and her exercise tolerance was greater than 4 metobalic equivalent tasks ("METs").[105] She reported smoking half a pack of cigarettes per week for twenty years, and experiencing snoring, but not necessarily sleep apnea.[106] Dr. Sisson recited Galvan's medical history, finding "a trough just lateral to the tibial crest where the muscle atrophied and the skin graft and the fasciotomy allowed the skin to adhere to the tibia and this crease is problematic," causing sores on her calf.[107] Dr. Sisson found that "it would be relatively straightforward to excise the abnormal skin and adhered redundant skin and close it over primarily to eliminate [the] trough. She understands this would not affect the skin graft nor the other scars . . . It also does not return any motor function."[108]

On April 14, 2009, Dr. Sisson performed a surgical revision of the long scar on her shin caused by the surgery to relieve her compartment syndrome.[109] Dr. Sisson reported that Galvan's

---

[101] R. at 460.

[102] *Id.*

[103] R. at 458 - 459.

[104] R. at 530.

[105] R. at 469. METs are a rough measure of oxygen consumption and exertion level. One MET is the amount of energy expended at rest, while four METs would be the equivalent of walking briskly for a mile, climbing stairs or cycling leisurely. Healthful Life Project, *Calculating Your Weekly Energy Expended In Recreational-Time Physical Activity Using METs (Metabolic Equivalent Task)*, UNIVERSITY OF MEDICINE & DENTISTRY OF NEW JERSEY, http://www.njms2.umdnj.edu/hwmedweb/archives/METsTbl.htm.

[106] *Id.*

[107] R. at 530.

[108] *Id.*

[109] R. at 526.

surgery went as planned and she left in satisfactory condition.[110]  Dr. Sisson's post-operative

instructions directed Galvan to avoid driving and heavy lifting, but allowed her to "weight bear as

tolerated."[111]  At Galvan's post-surgical follow-up, Dr. Sisson noted that the incision had not yet

healed enough to remove the stitches.[112]  Following her surgery, Galvan received prescriptions for

Tegretol and Gabapentin as an outpatient at the Saints Mary and Elizabeth Medical Center.[113]

**B.      The June 15, 2009 Hearing**

On June 15, 2009, a hearing was conducted in Peoria, Illinois, before ALJ Daniel Dadabo.[114]

Galvan appeared in person, and was represented by attorney Edwin Cohn.  During the hearing, the

ALJ heard testimony from Galvan, as well as VE, Craig Johnston.[115]

The ALJ began by examining Galvan, who described her own impairments as a left foot

drop, and previously, an open wound on her left shin that lasted for about six months.[116]  She stated

that she cannot move her foot much except for side to side, and that she has no control over her

toes.[117]  Galvan described her temporary jobs after her injury, and stated that standing at work caused

pain in both legs due to extra pressure on her right leg to favor her left, which caused  piercing and

tingling sensations sporadically throughout the day.[118]

Galvan also described pain in her hands when using a cane, which she had not discussed with

her doctor.[119]  Galvan described using her cane "as much as [she] need[s] to," but often using her

---

[110]  R. at 486-87.
[111]  R. at 462.
[112]  R. at 528.
[113]  R. at 533-36.
[114]   R. at 12-49.
[115]   R. at 37-47, 130.
[116]  R. at 15, 27.
[117]  R. at 27.
[118]  R. at 17.
[119]  R. at 35.

daughter's stroller for support instead.[120]  She stated that she could not work without the cane, although she never used it at work for fear her employers would fire her.[121] Despite her chest pain, Galvan stated that cardiology tests were normal.[122]

Galvan estimated that her physical activity would be limited to half an hour of standing, a walking distance of two blocks, and lifting or carrying about twenty pounds.[123]  Galvan reported piercing pains and cramps in her legs while sitting, including during the hearing.[124]  She stated that walking with shoes on causes her foot pain.[125]  Before putting on shoes, Galvan must apply an ACE bandage from her knee to her ankle[126] and place a brace inside her shoe.[127]  Galvan stated that after two hours she must take the brace and bandage off and elevate her leg until the swelling subsides (usually for one hour).[128]  To avoid sores, she does not wear the brace at home, which forced her to walk slowly in order to avoid tripping over her foot.[129]

According to Galvan, she wakes up early and slowly performs chores, including washing up and tending to her children.[130] Galvan stated that she independently cares for and transports her 23-pound daughter as necessary, including taking public transportation to medical check-ups.[131] Galvan's brother helps her with "the heavy stuff" such as laundry, grocery shopping and areas of the house that are difficult to clean, but Galvan does the rest herself.[132] She stated that she does

---

[120] R. at 36.
[121] Id.
[122] R. at 35.
[123] R. at 18.
[124] Id.
[125] R. at 19.
[126] R. at 27-28.
[127] R. at 29.
[128] Id.
[129] R. at 30.
[130] R. at 19.
[131] R. at 20.
[132] R. at 21-22.

dishes, sweeping, mopping and cleaning up after her daughter on her own.[133]

Galvan also discussed work she obtained after recovering from her gun shot wound and resultant surgeries.[134] She stated that she worked as a dishwasher for about one month, but had to quit because the job required her to be on her feet six hours a day and carry heavy trays.[135] She also described working two days per week as a counter at an inventory business, which required her to stand, and stated that she was terminated after her employer learned of her injury.[136]

The ALJ then questioned Galvan on her mental impairments. Galvan reported difficulty understanding and remembering new information when she returned to school in 2004, and at work.[137] Galvan stated that she took Sertraline and received counseling for depression.[138] She also reported taking Gabapentin and Cyclobenzaprine for pain, and Trazadone to sleep at night.[139] Galvan stated that her medication makes her drowsy, which slows her concentration.[140]

The ALJ questioned the VE next. The ALJ began by noting that none of Galvin's temporary jobs could be classified as substantial gainful activity.[141] The VE then classified those jobs. He stated that her work as a small products assembler was unskilled and light; her work as a caterer helper was semi-skilled and light; her work as a cellophane machine wrapper and hand packer was unskilled; and her work as a telephone operator was semi-skilled and sedentary.[142] Galvan's work as a pizza cook after her injury was skilled while her dishwasher work was unskilled; both required

---

[133] R. at 23.
[134] R. at 31-34.
[135] R. at 32-33.
[136] R. at 33-34.
[137] R. at 21-23.
[138] R. at 22.
[139] R. at 21-23.
[140] R. at 35.
[141] R. at 37.
[142] R. at 38.

medium exertional demand.[143]  The ALJ characterized Galvan as a relatively young person with an unskilled work background and a high school education equivalency, who cannot do work at more than light or sedentary exertion and whose work must be unskilled and learnable on short demonstration with no change from day to day.[144] The VE opined that a person with this RFC would be eligible for 38,000 assembly positions in the Chicago (8,000 sedentary jobs and 30,000 light jobs),[145] 10,000 sorting positions (5,000 sedentary jobs and 5,000 light jobs),[146] and 13,000 hand packaging jobs (all light jobs).[147]

The ALJ then sought the VE's opinion on several issues.  The VE stated that, for a worker who must use a cane to walk, only sedentary jobs would be available, but eligibility for these jobs would not be affected by walking with a cane.[148]  However, if the worker needed to elevate the leg to waist level, take unscheduled breaks every couple of hours to wrap or unwrap a leg, receive frequent prompts and reminders and extra supervision to stay on task, or take more than two days away from work each month, the worker would be ineligible for those sedentary jobs in the typical labor market.[149]  The VE stated that the worker might be qualified for other "sheltered workshop" jobs, but the worker could not compete in the typical labor market.[150]  However, working in a team setting with constant but light supervision would not be a bar to competitive employment, nor would a limitation to carrying light weights with only one hand.[151]

III.    THE ALJ'S DECISION

---

[143] *Id.*
[144] R. at 39.
[145] *Id.*
[146] *Id.*
[147] R. at 40.
[148] *Id.*
[149] R. at 40-42.
[150] R. at 42, 46.
[151] R. at 42-43.

In his September 1, 2009 opinion, the ALJ applied the Act's sequential five-step analysis and found that Galvan was not disabled within the meaning of the Act and, therefore, was not entitled to DIB or a period of disability.[152]  Substantial gainful activity includes work that a claimant did before the impairment and any other kind of gainful work generally available in significant numbers within the national economy.[153]  During the five-step evaluation, the ALJ must determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[154]  A finding of disability requires an affirmative answer at either step three or step five, while a negative finding at any step other than step three precludes a finding of disability.[155]  To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[156]

As an initial matter, the ALJ determined that Galvan met the insured status requirements of the Act through December 31, 2008.[157]  At step one, the ALJ found that Galvan had not engaged in substantial gainful activity since March 1, 2007, the alleged disability onset date;[158] however, she

---

[152]  R. at 69.
[153]  42 U.S.C. § 404.1520(a)(4).
[154]  *Id.*
[155]  *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).
[156]  42 U.S.C. § 423(d)(1)(A).
[157]  R. at 59.
[158]  *Id.*

had been engaged in part-time work at an inventory warehouse for about six months after the onset date, which the ALJ considered at later steps in his evaluation of Galvan's work-related RFC.[159]

At step two, the ALJ found that Galvan suffered from the following severe impairments: a history of gunshot wounds, primarily affecting the left leg, with residual nerve damage and scar tissue; depressive disorder; anxiety disorder, with panic attacks; and a history of substance abuse, now in remission.[160] The ALJ concluded that these impairments cause more than minimal functional limitations, although he also found that the diffuse bilateral leg and hand pain that Galvan reported was not medically-determinable, and because symptom description alone is insufficient to establish the presence of an impairment, he did not include those symptoms in his determination.[161]

The ALJ concluded at step three that none of Galvan's impairments, or any combination of her impairments, meets or medically equals any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[162] The two musculoskeletal impairments that Galvan specifically alleged were listings 1.02(a) (major dysfunction of a weight-bearing joint resulting in inability to ambulate effectively) and 1.08 (soft tissue injury under continuing surgical management).[163]

The ALJ discussed Galvan's original physical impairments, which began with her gunshot wounds and nerve damage.[164] However, the ALJ found that Galvan's surgeries in 2000 and 2009 restored "major function" of Galvan's leg, including ability to ambulate, notwithstanding some residual pain and limitation.[165] The ALJ found that Galvan's alleged difficulty with walking was

---

[159] *Id.*
[160] R. at 59-60.
[161] R. at 60, citing SSR 96-4p.
[162] *Id.*, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.25 and 416.926.
[163] Dkt. 24 at 4.
[164] R. at 60.
[165] *Id.*

not supported by the evidence or Galvan's own testimony, which included her statement that after the date of her alleged disability onset, she took labor jobs that the VE classified as light to medium, "meaning that [Galvan] had to perform substantial standing, walking, lifting, carrying and reaching."[166] Therefore the ALJ found that Galvan's impairments did not meet or equal the criteria of Listing 1.02, which require an inability to ambulate effectively.[167] Noting the seven-year lapse of time between Galvan's 2000 arterial repair and her 2009 scar revision surgery, the ALJ also found that Galvan could not be considered to be under "continuing surgical management," and therefore her impairments did not meet the criteria for Listing 1.08.[168]

The ALJ next observed that the paragraph B criteria of Listings 12.04 (affective disorders), 12.06 (anxiety disorders) and 12.09 (substance abuse disorders) could be satisfied only if Galvan's mental impairments resulted in at least two of the following: "marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration."[169] The ALJ explained that repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks.[170]

Based on Galvan's testimony that she is able to independently care for herself and at least one of her children, the ALJ found that Galvan's mental impairments caused no restrictions on her daily living activities, given that these include performing household chores, keeping appointments

---

[166] *Id.*
[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] *Id.*

and traveling independently.[171]  The ALJ found that Galvan has mild difficulties with social functioning due to a history of trauma and abuse, which makes her nervous in crowds, but that the record shows she is capable of interacting appropriately with others when she chooses.[172]

The ALJ further found that Galvan has moderate difficulties concentrating due to intrinsic deficits and medication side-effects.[173]  However, he found that any difficulty on this score will not significantly limit Galvan's ability to persist at tasks or perform at a consistent pace, and has only a moderate impact on her functioning, making a "marked" limitation unwarranted.[174]  Nor did the ALJ find that the evidence of Galvan's depression symptoms provided any support for episodes of psychiatric decompensation.[175]  The ALJ noted that the single-day outpatient hospitalization Galvan experienced, as a result of drug abuse, was the only documentation of any possible decompensation, and that it was not expected to continue for twelve months at the severity then present.[176]  Consequently, the ALJ concluded that the paragraph B criteria were not satisfied because Galvan did not have at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration.[177]

The ALJ also determined that Galvan's impairments did not satisfy the paragraph C criteria of the 12.00 listings.[178] He found that neither the evidence nor Galvan's testimony fulfilled any of the listing criteria because nothing in the record showed that Galvan is unable to function outside of her home, that she requires a highly supportive living arrangement, or that a minimal increase in

---

[171] R. at 60-61.
[172] R. at 61.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*

mental demands would cause her to decompensate.[179] The ALJ noted that, to the contrary, the record reflected that Galvan had expressed enthusiasm about vocational training and becoming employed,[180] and that overall, the record showed Galvan "retains a fair amount of adaptive functioning, persistence, attention and concentration."[181]

The ALJ then moved to steps four and five of the analysis, using the criteria of paragraph B as a method of rating Galvan's RFC, both mental and physical.[182] To make conclusions about Galvan's symptoms and their effects on her RFC, the ALJ considered the evidence using a two-step process: he first determined whether each symptom had an underlying medically determinable cause, and second, he evaluated the intensity, persistence or functionally limiting effects of pain or other symptoms on Galvan's basic work activities.[183] For this second purpose, the ALJ made a finding of credibility about any statements regarding Galvan's symptoms that were not substantiated by objective medical evidence.[184]

A.    **Galvan's Physical Impairments**

The ALJ first considered the objective medical evidence of Galvan's impairments. He recited Galvan's medical history as set forth by Dr. Debbie Weiss in Galvan's State consultative examination, including the gunshot wounds she suffered in her legs and buttocks in 2000, leading to a fasciotomy of her left calf, repair of the artery in her left leg and buttock, and her left foot drop.[185] The ALJ considered Galvan's report that she wore an ankle brace and got cramping,

---

[179]  *Id.*
[180]  *Id.*
[181]  R. at 67.
[182]  R. at 62.
[183]   *Id.*
[184]   *Id.*
[185]   *Id.*

numbness and piercing pain in the left foot, and that she experienced irritation of her scars, although her pain was responsive to medication.[186]  The ALJ noted that Galvan had fallen on the stairs due to her foot drop, for which he wore an orthotic on her left ankle because she was unable to heel walk.[187]  The ALJ noted further that Dr. Weiss found Galvan to have full range of motion of all joints, motor strength and sensation, and intact peripheral pulses, except for motion of the left ankle, which measured 0/5 in dorsiflexor strength.[188]

The ALJ then considered records from Galvan's visit to Stroger Hospital ER, and noted Galvan's report of knee pain and swelling in her left third toe, leading to a diagnosis of paronychia and prescription drug treatment.[189]  The ALJ also noted that P.A. Durojaiye recorded Galvan's complaints of lower extremity pain in August and October, 2008, and found edema in her left foot.[190]  However, the ALJ further noted Galvan's self-report in October that her pain was not affecting her activity level and that she did not need her medical provider to address her pain; and that as of November 25, 2008, "she felt about 70% better."[191]  The ALJ also noted that the orthopedic examination at the Clinic revealed dorsiflexion weakness in the left foot due to nerve injury.[192]

The ALJ noted Galvan  reported weakness and cramping in both legs, feet and hands, and particular pain in the thigh during her January 22, 2009 consultation with Dr. Sisson.[193]  The ALJ also observed Dr. Sisson's finding of very weak plantar flexion, and that Galvan underwent a revision of the scar on her left leg on April 14, 2009.[194]  The ALJ cited reports from Winfield

---

[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] Paronychia is a fungal infection of the skin.  *See* R. at 62-63.
[190] R. at 63.
[191] *Id.*
[192] *Id.*
[193] R. at 529.
[194] *Id.*

showing that, by July, Galvan reported fair to good pain response from an increase in Gabapentin, although she suffered and received treatment for diarrhea as a side-effect.[195]

Based on Galvan's consistent complaints and the multiple objective findings of weakness and sensory disturbance to her left leg throughout the record, the ALJ found credible Galvan's claims that she has significant difficulty standing and walking for prolonged periods of time.[196] The ALJ therefore inferred that Galvan is reasonably limited to only occasional standing and walking in a work setting, for about two out of eight hours in a day.[197]

However, the ALJ found that Galvan's claim that she requires a cane to walk was not credible.[198] The ALJ relied on records from a 2005 ER visit, which noted that Galvan walked unassisted, and a notation from Dr. Weiss that Galvan's gait was steady, and observed that her consultative examination report listed her use of an orthotic but did not mention a cane.[199] The ALJ concluded that Galvan may have needed an assistive device immediately following her revision surgery, but found no evidence that Galvan was significantly limited in her ability to ambulate even occasionally during any twelve-month period.[200] The ALJ noted , however, a cane requirement would nevertheless be accounted for by Galvan's RFC of sedentary work, which permitted use of a cane.[201]

The ALJ further found that Galvan's claims of poor concentration due to pain and medication side-effects, and extensive time requirements for elevating or re-wrapping her leg were not

---

[195] Id.
[196] Id.
[197] Id.
[198] Id.
[199] Id.
[200] Id.
[201] Id.

credible.[202]  The ALJ found that Galvan's earlier reports, as recorded by her doctors, did not support this degree of debilitation.  As an example, the ALJ referred to P.A. Durojaiye's notations that Galvan indicated her pain was not affecting her daily activities.[203]  He also noted that no doctor advised Galvan to elevate her leg for a significant portion of the day, other than during her post-surgical recovery in 2009.[204]  The ALJ found that Galvan had never discussed sitting problems with her treating sources, and concluded that her impairments did not suggest a sitting limitation.[205]

With respect to activities of daily living, the ALJ found that Galvan had not reported any substantial interference with her ability to attend and care for an infant child, "which tends to denote some measure of retained work-related functioning."[206]  This was supported by the State consulting physician, Calixto Aquino, who opined that Galvan was able to perform light work.[207]

After considering this evidence, the ALJ found that Galvan's alleged symptoms could reasonably be caused by Galvan's medically determinable impairments, but also found that Galvan's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC.[208]  However, based on Galvan's complaints, the need for revision surgery, the objective findings of weakness and decreased sensation in Galvan's left foot, and her mild obesity,[209] the ALJ found Galvan limited to sedentary work.[210]

---

[202]  *Id.*
[203]  *Id.*
[204]  *Id.*
[205]  *Id.*
[206]  R. at 64.
[207]  *Id.*
[208]  *Id.*
[209]  Referring presumably to Dr. Sisson's records from July, 2009, the ALJ noted that at 5'4" and 179 pounds as of July 2009, Galvan had a body mass index of 30.77, "consistent with mild obesity under SSR 02-1p." R. at 64.
[210]  *Id.*

**B.      Galvan's Mental Impairments**

The ALJ first noted that in February 2008, Galvan presented as alert, attentive and cooperative at Stroger Hospital, despite her depressed and anxious appearance.[211] The ALJ also noted that R.N. Prado found Galvan's thought processes appropriate, her memory intact, her attention and concentration good, and her insight fair.[212] The ALJ further noted Galvan's prescriptions for depression, her reported substance abuse and chronic pain, her paranoia and fear of loud noises, and the global assessment of functioning ("GAF") score of 40 that she received in March 2008.[213] The ALJ observed that a GAF of 31-40 "is indicative of some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment or mood."[214] The ALJ noted Galvan's March 2008 report that she abused drugs, and that her children were removed due to her substance abuse.[215] However, the ALJ found that no reports of this GAF score or ongoing substance abuse appear in later records.[216]

The ALJ then noted that Galvan recounted her history of depression, a remote suicide attempt, and worsening depression after being shot during a March 2008 consultative examination.[217] The ALJ also noted Galvan's reports to Dr. Weiss of panic attacks, which were relieved by splashing cold water on her face.[218] The ALJ referred to Dr. Weiss's findings that Galvan's orientation, memory, appearance, behavior and ability to relate during examination were "entirely within normal limits."[219] The ALJ noted Dr. Weiss's report that Galvan did not appear depressed or anxious, and

---

[211] R. at 64.
[212] *Id.*
[213] *Id.*
[214] *Id.*
[215] *Id.*
[216] *Id.*
[217] R. at 65.
[218] *Id.*
[219] *Id.*

that her symptoms were controlled on Sertraline.[220]

The ALJ noted that Galvan exhibited good eye contact, was psychiatrically stable on medications, and denied suicidal or homicidal ideation, though she exhibited a flat aspect during her July 2008 examination.[221] The ALJ found that Galvan's worst difficulties occurred in the months following February, 2008, including reports of nervousness, jitteriness and difficulty concentrating.[222] The ALJ noted that these symptoms, as well as reports from evaluations that Galvan seemed "out of it," coincided with the first instance of Galvan's treatment for substance abuse, while she was "newly abstinent from drugs and alcohol."[223]

The ALJ discussed Galvan's desire to regain custody of her other children as a motivation for her continued psychiatric counseling from March 2008 onward.[224] The ALJ indicated that Galvan's greatest psychological limitations had passed, as demonstrated by Galvan's stable mental state before and after her child custody court appearance, where she reported displaying assertiveness toward the judge.[225] The ALJ noted that, although Galvan experienced more panic attacks during her graduation from her substance abuse program, she reported no urges to use drugs, denied insomnia, and had fewer PTSD triggers, despite continued anxiety while traveling at night.[226]

The ALJ noted that Galvan's improvements were accompanied by her completion of a vocational program and placement on two housing waiting lists in October 2008.[227] The ALJ further noted that Galvan had begun a part-time inventory job at this time, and reported that her job was

---

[220] *Id.*
[221] *Id.*
[222] *Id.*
[223] R. at 66.
[224] R. at 65.
[225] *Id.*
[226] *Id.*
[227] *Id.*

going well.[228]  The ALJ noted that, by January 2009, Galvan reported doing well at work and attending drug rehabilitation meetings, and that in February and March 2009, she continued to report absence of suicidal ideation despite insomnia over custody battles and flashbacks of abuse.[229]  The ALJ noted that by May 2009, Galvan was sad about being separated from her children but was taking positive steps to get them back, and that while Galvan reported difficulty trusting people due to her history of abuse and trauma, her new therapist described her as "managing well in her sobriety" with diminished depression.[230]  The ALJ noted that Galvan was described as making progress in May 2009, despite family challenges.[231]  The ALJ further noted that, on June 8, 2009, Galvan expressed enthusiasm about enrolling in a job training program and reported the absence of flashbacks and nightmares in recent weeks.[232]

Based on this evidence, the ALJ concluded that Galvan's rehabilitative therapy "was effective in restoring functioning and a measure of adaptive coping skills."[233]  The ALJ also noted that, while Galvan reported difficulty trusting others and having few friends, she demonstrated good judgment in distancing herself from former acquaintances who abused drugs and maintained healthy relationships with family members.[234]  The ALJ also considered that Galvan successfully advocated for herself in obtaining increased visitation of her children and independently caring for her infant.[235]  The ALJ found that Galvan's alleged trust issues and problems with memory, concentration, anxiety, and depression were outweighed by evidence of substantial persistence, adaptive functioning,

---

[228] *Id.*
[229] *Id.*
[230] R. at 66.
[231] *Id.*
[232] *Id.*
[233] R. at 65.
[234] R. at 65-67.
[235] R. at 67.

concentration and attention.[236]  Thus the ALJ found that Galvan's mild mental impairments would not preclude her from interacting appropriately with coworkers and supervisors in a limited work setting that accounts for her vulnerability to anxiety.[237]

The ALJ also found that Galvan retains significant mental capacity based on the minimal interference from anxiety in her daily life.  He observed that Galvan's anxiety about passing drug dealers and using public transit at night had not prevented her usual activities, and that this anxiety would be a  normal response to such situations even for individuals who are not coping with an anxiety disorder.[238]  The ALJ further found that Galvan's complaints about lack of concentration were unsupported by the record, since she enjoyed such complex activities as playing piano, writing songs and doing Sudoku puzzles.[239]

Based on the ALJ's consideration of this evidence, he found that Galvan has been capable of unskilled work since her alleged disability onset.[240]  Specifically, the ALJ found that although Galvan's physical limitations preclude her from working around unprotected heights or heavy machinery, and that although her mild mental impairments place moderate restrictions on her ability to concentrate and perform complex or changing instructions, Galvan retained residual functional capacity for sedentary work as defined in 20 C.F.R. 401.1567(a) and 416.967(a).[241]  In so finding, the ALJ accorded limited weight to the report of State consultant, John Tomassetti, Ph.D., who opined that Galvan had moderate limitations with respect to maintaining social function, concentration, persistence and pace, in particular, in her ability to understand and remember detailed

---

[236] *Id.*
[237] *Id.*
[238] R. at 66.
[239] R. at 67.
[240] *Id.*
[241] *Id.*

instructions, complete a normal workday and workweek, perform within a schedule and be punctual, interact appropriately with the general public, and set realistic goals or make independent plans.[242] The ALJ reasoned that, because it was completed in February, 2008, Dr. Tomassetti's report did not take into account Galvan's admitted improvement after that time, or her normal mental status upon examination in May 2009.[243] However, the ALJ also noted Dr. Tomassetti's report that Galvan was capable, even in February 2008, of a wide range of daily activities, including caring for her child.[244]

Next, the ALJ determined that Galvan had never engaged in substantial gainful activity, and thus had no vocationally significant past relevant work or transferable job skills.[245] The ALJ found that Galvan was 30 years old on the date of alleged disability onset, and therefore was a younger individual under 20 C.F.R. 404.163.[246] He further found that, considering Galvan's age, education, work experience and residual functional capacity, significant numbers of jobs that Galvan could perform exist in the national economy.[247] Based on the VE's testimony, and given Galvan's individual characteristics (including her alleged need to use a cane), the ALJ found that Galvan would be able to perform numerous jobs, including those of assembler and sorter.[248] Thus, the ALJ concluded that Galvan was not disabled under the Act.[249]

IV.    STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual

---

[242]  *Id.*
[243]  *Id.*
[244]  *Id.*
[245]  R. at 68; citing 20 C.F.R. §§ 404.1568 and 416.968.
[246]  R. at 68.
[247]  *Id.*
[248]  *Id.*
[249]  R. at 69.

determinations are entitled to deference.[250]  The District Court will uphold the ALJ's decision if substantial evidence supports the ALJ's findings and if the findings are free from legal error.[251]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate findings as to disability.[252]  However, the ALJ must build an accurate and logical connection from the evidence to his ultimate conclusion.[253]  While the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate his reasons for crediting or discrediting evidence of disability.[254]

## V.     ANALYSIS

Galvan argues that the ALJ's findings were not supported by substantial evidence.  In particular, Galvan contends that the ALJ erred by: (1) failing to accord adequate weight to the opinions of Galvan's treating physician, Dr. George Sisson;[255] (2) improperly finding that Galvan's mental impairments, when combined with her physical limitations, did not meet or equal listing 12.04 or 12.06;[256] and (3) improperly finding that Galvan has the capacity to perform sedentary work, given the VE's response to the ALJ's hypothetical.[257]  We address each argument in turn.

### A.     The Opinion of Dr. George Sisson

Galvan argues that the ALJ failed to give appropriate weight to the opinion of Dr. George Sisson, the orthopaedic surgeon who performed a scar revision surgery on Galvan's left leg.  Galvan contends that the ALJ failed to mention Dr. Sisson,[258]and thus lacked proper medical support for his

---

[250] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[251] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[252] *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).
[253] *Dixon v. Massanori*, 270 F.3d 1171, 1176 (7th Cir. 2001).
[254] *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).
[255] Dkt. 24 at 2.
[256] *Id.* at 7.
[257] *Id.* at 8.
[258] *Id.* at 4-5.

determination that Galvan's impairments did not meet listing 1.02(a) (major dysfunction of a weight-bearing joint resulting in inability to ambulate effectively) or 1.08 (soft tissue injury under continuing surgical management).[259]   In response, the Commissioner contends that Galvan misconstrued the ALJ's opinion by failing to notice that the ALJ referred to Dr. Sisson's reports in the same way he referred to all evidence in the record – by exhibit number rather than by name.[260] The Commissioner further argues that the ALJ accorded appropriate –  though not controlling – weight to Dr. Sisson's records because Dr. Sisson did not actually give a medical opinion about Galvan's impairments; instead, Dr. Sisson merely "reiterated Plaintiff's diagnosis, history of treatment, subjective complaints, his pre-operative exam findings, and his post-operative comment that the incision looked fine and it was too early to remove the stitches."[261]

In support of this contention, the Commissioner relies on 20 C.F.R. 404.1527(a)(2), which defines medical opinions as "statements . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment[s], and [her] physical or mental restrictions."  The Commissioner argues that, though Dr. Sisson did not render a medical opinion under this rubric, the ALJ gave credence to Dr. Sisson's reports, insofar as they were consistent with the other doctors' findings that Galvan was unable to stand or walk for prolonged periods.[262]

Under 20 C.F.R. 404.1527(d)(2), the ALJ must give controlling weight to the opinion of a treating physician, provided the physician's opinion is medically well-supported and is not

---

[259] *Id.* at 6.
[260] Dkt. 27 at 9.
[261] *Id.* at 10.
[262] *Id.*

30

inconsistent with other evidence in the record.[263]  The medical opinions of treating physicians are generally favored based on their ability to provide "a detailed, longitudinal picture" of the patient's medical impairments, which may not be obtainable from isolated examination reports.[264]

Dr. Sisson's reports focus primarily on the surgical intervention to repair Galvan's scar and reveal little – if anything – about her functional limitations.  Dr. Sisson's most comprehensive description of Galvan's condition was contained in his pre-operative report, where he noted Galvan's history of a neurovascular injury in 2000 (when she was shot), requiring repair of an artery,[265] as well as decompression of her calf muscles after developing compartment syndrome.  He also noted that Galvan had necrotic muscle debrided and underwent a fasciotomy to provide a skin graft to cover the scar resulting from the earlier fasciotomy surgery.[266]  Dr. Sisson noted that his surgery would repair an irritating scar "just lateral to the tibial crest where the muscle atrophied and the skin graft and the fasciotomy allowed the skin to adhere to the tibia."[267]  Dr. Sisson then listed Galvan's reported symptoms: (1) inability to dorsiflex her left foot; (2) an "unsightly, painful and irritating scar from a fasciotomy of the left leg," as well as some other smaller scars; (3) chronic pain in both legs and cramping in Galvan's feet and hands; and (4) sores on her calf due to sweat and friction between Galvan's orthotic[268] and the uneven surface of her scar.[269]  Dr. Sisson's only mention of Galvan's mental impairments occurred under the heading "Past Medical History," where he noted that Galvan is receiving drug and counseling therapy for depression.[270]

---

[263] *See* 20 C.F.R. 404.1527(d)(2).
[264] *Id.*
[265] R. at 530.
[266] *Id.*
[267] *Id.*
[268] Galvan uses the orthotic to ease walking, or, to treat her dropped foot condition. R. at 28.
[269] *Id.*
[270] R. at 530.

Contrary to Galvan's argument, the ALJ indeed referenced Dr. Sisson's reports (cited as exhibit 30F).[271] Further, we are unable find in those reports a medical opinion bearing on Galvan's limitations that would be entitled to controlling weight under 20 C.F.R. 404.1527(a)(2). Dr. Sisson's reports are limited to Galvan's subjective complaints, his confirmation of past diagnoses of other doctors, and the prognosis of Galvan's scar revision surgery. Dr. Sisson did not opine on Galvan's ability to bear weight, beyond noting weakness in Galvan's left foot, which he observed was already treated with a full-time orthotic.[272] Dr. Sisson's reports do not consider the prognosis of Galvan's impairments generally, and he did not give any opinion about Galvan's functional capacity in light of her impairments and restrictions, either physical or mental. The narrow scope of Dr. Sisson's reports is not surprising, considering his interaction was Galvan was incident to a single surgical intervention. Because Dr. Sisson's reports do not express the type of medical opinions customarily accorded controlling weight, the ALJ was not required to address them in this context.

Further, we find that the ALJ did not ignore Dr. Sisson's notes, but accorded adequate weight to them by paraphrasing Dr. Sisson's report of Galvan's dorsiflexion and pain issues, and directly citing Dr. Sisson's report in his opinion.[273] The ALJ specifically cited one of Dr. Sisson's reports, Exhibit 30F, when forming his conclusion that the weakness and foot drop described by Dr. Sisson would reasonably limit Galvan "to only occasional standing and walking (i.e., about 2 hours in an 8 hour day)."[274]

Further, since Dr. Sisson's reports do not include any distinct or independent evidence of disability, it is difficult to see how according controlling weight to his reports would have changed

---

[271] R. at 63.
[272] *Id.*
[273] R. at 63.
[274] R. at 63.

the ALJ's conclusion. The Court "will not remand a case to the ALJ for further specification where [it is] convinced that the ALJ will reach the same result."[275] As the Seventh Circuit has observed, to do so "would be a waste of time and resources for both the Commissioner and the claimant."[276]

Galvan's primary issue with the weight accorded to Dr. Sisson's reports appears to be her belief that the reports would have supported a finding of disability under Listing 1.08,[277] which permits an ALJ to find the claimant disabled if the claimant is under "continuing surgical management."[278] To meet Listing 1.08, surgical management must be "directed toward the salvage or restoration of major function." Galvan argues that she meets Listing 1.08 because she has undergone five surgeries and major function has not, she asserts, been restored to her leg.[279]

Galvan's scar revision surgery from Dr. Sisson would not fulfill Listing 1.08 for three independent reasons. First, as the ALJ found, although Galvan underwent surgery in 2000 for the gunshot injury and again in 2009 for her scar revision, "the interval between these operations independently would denote that the claimant was not under 'continuing surgical management.'"[280] Second, the scar revision surgery was not intended to return motor function, Dr. Sisson's pre-operative report clearly indicates that he instructed Galvan prior to the surgery that the operation would "not return any motor function."[281] Third, the ALJ found that, for purposes of Listing 1.08, Galvan's surgeries did in fact restore "major function" to her leg.[282]

The ALJ's determination on this third point is consistent with the regulations. "Effective

[275] *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).
[276] *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).
[277] Dkt. 24 at 5-6.
[278] Dkt. 24 at 4, Dkt. 27 at 4.
[279] Dkt. 24 at 6.
[280] R. at 60.
[281] R. at 530.
[282] R. at 60.

ambulation" is defined at 1.00(B)(2)(b)(2) as having "the ability to travel without companion assistance to and from a place of employment or school." "[M]ajor dysfunction of a joint," conversely, is defined at Listing 1.02(A) as an inability to ambulate effectively, which in turn is defined at Listing 1.00(b)(1) as "an extreme limitation of the ability to walk...[or] insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities" (emphasis added). Here, the ALJ found that no medical expert (including Dr. Sisson) opined that Galvan requires even a cane for ambulation,[283] and that this, coupled with Galvan's self-reported ability to work part time and care for herself and her child independently,[284] shows that Galvan retains "major function" of her leg, "notwithstanding some residual pain and limitation."[285] The ALJ's findings of fact on this issue are supported by substantial evidence, and thus may not be disturbed by our review.[286]

Finally, in the context of Galvan's argument regarding Dr. Sisson's opinion, Galvan takes issue with the fact that no medical expert was called to testify and argues that the ALJ did not seek any medical opinion on the issue of medical equivalence.[287] The Commissioner responds that the ALJ is not required to seek medical testimony unless the ALJ receives evidence that, in his opinion, could change the State agency medical expert's finding that the claimant's impairment is not equivalent to any Listed Impairment.[288] According to the Commissioner, no such evidence was received, and thus the ALJ's consideration of the forms submitted by Drs. Aquino and Travis[289]

---

[283] R. at 63.
[284] R. at 60.
[285] R. at 60.
[286] *Olsen v. Apfel*, 17 F.Supp.2d 783, 786-87 (7th Cir. 1998) (citations omitted).
[287] Dkt. 27 at 6.
[288] *Id.* at 8, citing Social Security Rulinh ("SSR") 96-6p.
[289] R. at 50-53.

fulfilled his duty to consider expert medical evidence on the question of equivalence.[290]

The Commissioner has the better argument. When determining whether a claimant's impairments are equivalent to a Listing, the ALJ must consider at least one doctor's medical opinion on the issue.[291] Under Social Security Ruling ("SSR") 83-19, consideration of a SSA Form 831 that was completed and signed by a doctor fulfills the ALJ's duty to consider an expert opinion on the question of equivalency before making his legal determination. As the Commissioner points out, two doctors provided 831 forms, which the ALJ duly considered.[292] Moreover, we are unable to find any evidence that "may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."[293] Here, the ALJ observed medical opinions that were consistent; each physician found that Galvan suffered from a left foot drop and neuropathy in her feet and legs.[294] Although "[a]n ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable,"[295] the well-developed and consistent body of medical evidence in this case presented no mystery for ALJ Dadabo.

Finally, Galvan appears to challenge the ALJ's credibility determination on the sole basis that it "[did] not take into consideration the findings of all the treating doctors," in particular, Dr. Sisson.[296] An ALJ's credibility determination will not be overturned unless it is "patently wrong" and unsupported by the record.[297] In supporting his credibility determination, the ALJ relied on the

---

[290] *Id.* at 8-9, citing *Barettt v. Barnhart*, 381 F.3d 664, 671 (7th Cir. 2004).
[291] *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989).
[292] R. at 67.
[293] *See* Social Security Ruling ("SSR") SSR 96-6p.
[294] R. at 62-63, citing medical records from Dr. Debbie Weiss (ex. 8F), Dr. Murad Abdel-Qader (ex. 21F) and Dr. Sisson (ex. 30F).
[295] *Barnett*, 381 F.3d 664 at 669 (citing 20 C.F.R. § 404.1527(c)(3)).
[296] Dkt. 28 at 5.
[297] *Barnett*, 381 F.3d 664 at 670 (citing *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)).

opinion of State agency physician, Dr. Calixto Aquinas, that Galvan was able to stand, walk or sit, with normal breaks, for a total of about six hours in an eight-hour workday.[298]  The ALJ did not refer to Dr. Sisson or Dr. Abdel-Qader in the credibility determination portion of his opinion.[299]  However, an ALJ need not discuss every item of evidence.[300]  Galvan has failed to show how mention of these physicians would have altered the ALJ's credibility determination, which we find was well-supported by evidence in the record.  For the reasons explained above, we find that the ALJ accorded appropriate weight to the reports of Dr. Sisson.

**B.    Galvan's Mental Impairments**

Galvan argues that the ALJ erred in finding that her mental impairments do not meet or medically equal the criteria of listing 12.04 (affective disorder) or 12.06 (anxiety disorder) because the ALJ failed to consider Galvan's mental problems "when packaged with" her physical problems.[301]

After careful review, the Court finds that the medical evidence does not support Galvan's assertion that she meets or equals Listing 12.04 or 12.06.  Galvan points to her diagnoses of major depression, post-traumatic stress disorder ("PTSD") and post-polysubstance abuse.[302]  However, as the Commissioner observes, Listings 12.04 and 12.06 do not contemplate physical impairments, and require that a claimant must have at least two of the following: (1) marked restriction of daily living activities; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of

---

[298]  R. at 358.
[299]  R. at 400.
[300]  *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).
[301]  Dkt. 24 at 7.
[302]  *Id.* at 7-8.

extended duration.[303]  The Commissioner notes further that a claimant "cannot meet the criteria of a listing based only on a diagnosis"[304] because diagnoses do not identify functional limitations that flow from diagnosed impairments, and they do not address work-related limitations.[305]

As the ALJ correctly pointed out, the record contains no medical evidence of any marked limitations or difficulties, nor any documented episodes of decompensation of extended duration. Further, despite Galvan's subjective complaints of difficulty with concentration, the ALJ observed that she is able to independently care for her infant daughter, as well as write songs, play piano, and solve Sudoku puzzles.[306]  The ALJ also noted that Galvan's treatment for substance abuse appears to have been effective, pointing to therapy notes reflecting that Galvan's urge to use drugs had subsided and that she was "managing well in her sobriety," and having fewer PTSD triggers.[307] Galvan argues that the March 2008 GAF score of 40 assigned by Dr. Tomassetti supports a finding of disability.  However, as the ALJ pointed out, Galvan was newly abstinent from substance abuse at that time and this low score never appeared again in the record.[308]  Although the ALJ does not expressly mention Galvan's later GAF score of 70,[309] he was correct in his observation that her GAF score of 40 was an isolated occurrence.   Accordingly, the ALJ appropriately provided reasons for giving limited weight to the opinion of Dr. Tomassetti in his determination, which the ALJ deemed to be evidence of disability.  We find no legal error in this aspect of the ALJ's decision.

The ALJ also comprehensively discussed evidence of Galvan's ability to overcome her

---

[303] Dkt. 27 at 6, citing 20 C.F.R. § 404(P), App. 1, §§ 12.04B, 12.06B.
[304] *Id.*, citing 20 C.F.R. §§ 404.1525(d), 416.925(d).
[305] *Id.*, citing *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991).
[306] R. at 19, 67.
[307] R. at 65-66.
[308] R. at 64; dkt. 27 at 7.
[309] Dkt. 27 at 7, citing reports from Krista Sherinian, Galvan's counselor at the Family Services and Mental Health Center of Cicero, on  December 30, 2008 and April 13, 2009.

depression and anxiety, including reports that Galvan persisted in her quest for custody of her children, cared for her daughter, successfully completed a vocational training program, and maintained healthy relationships with her family.[310] For the reasons stated above, the Court affirms the ALJ's determination that Galvan does not meet or medically equal listings 12.04 or 12.06.

## C.     The RFC Determination

Galvan argues that the ALJ improperly assessed Galvan's RFC based on portions of the VE's testimony, which she claims support a finding of disability.[311] Galvan refers to the VE's testimony that certain impairments suggested by the ALJ would render a hypothetical claimant ineligible for employment in the competitive labor market.[312]   The Commissioner responds by arguing that significant numbers of competitive jobs exist for a person with Galvan's RFC, and that the ALJ later rejected certain hypothetical limitations as beyond those supported by the evidence.[313]

The ALJ discussed the VE's testimony, which showed that an individual with Galvan's age, education, work experience and limitations on her residual functional capacity for sedentary work would still be eligible for thousands of jobs in the national economy.[314] In particular, the VE testified that a person with Galvan's RFC would be able to perform about 8,000 assembler jobs and about 10,000 sorter jobs, even if the individual was limited to a work setting with the following provisions: the work is learnable on short demonstration and does not change from day to day; the work takes place in a group setting where a team leader provides supervision and frequent prompts; and the

---

[310] R. at 66-67.
[311] Dkt. 24 at 9-10.
[312] *Id.* at 10.
[313] Dkt. 27. at 13-14.
[314] R. at 68.

individual walks with a cane in one hand, but is able to lift about ten pounds with the free hand.[315] The VE opined that a person who must take long breaks to re-wrap her leg, who is unable to finish her work independently, or who must take more than a few days away from work each month, would not be employable,[316] but the ALJ later concluded that Galvan's allegations regarding these additional limitations were not credible. As explained above, the ALJ's credibility determination was sufficiently supported by the evidence; thus, the ALJ was not required to adopt the VE's findings regarding hypothetical limitations which he determined that Galvan did not possess.

VI.     CONCLUSION

For the reasons set forth above, Galvan's motion for summary judgment [dkt. 24] is denied, and the Commissioner's motion [dkt. 26] is granted. We, therefore, affirm the decision of the Commissioner.


_____

**Honorable Susan E. Cox**
**United States Magistrate Judge**


**Dated: September 28, 2011**

---

[315] R. at 39-40.
[316] R. at 41-42.